Dear Representative Salter:
You have requested an opinion from this office concerning the minimum reservoir level for routine power generation in connection with the Toledo Bend Project. Submitted with your request were numerous documents which included a copy of (1) the Federal Power Commission License; (2) the Consolidated Power Sales Agreement (PSA) between the Sabine River Authorities of Louisiana and Texas (SRA's) and Central Louisiana Electric Company, Gulf States Utilities Company and Louisiana Power 
Light Company (Companies); and (3) a document known as the Operating Guide Rule Curve for the Hydro-Electric Power Plant, Toledo Bend Dam.
As you know, we have advised that the interpretation of contracts, especially those as technical as the ones submitted with your request, is more appropriately done by the judiciary in action for declaratory judgment. This course of action is certainly more definitive when you consider that an opinion of this office does not have the force and effect of law. Furthermore, any opinion rendered by this office is subject to change if the facts surrounding the situation out of which a legal question arises changes or is supplemented with more specific and detailed information.
In light of the above, our response to the situation you have outlined should be considered as a general analysis of the legal implications of the facts as we presently understand them.
It is important to note at the beginning of this analysis that all parties do not dispute the fact that the SRA's control the draw down of the water level of the reservoir. This is most evident and demonstrated by the fact that the SRA's have agreed to indemnify and hold harmless the Companies from damages resulting directly or indirectly from the SRA's performance or failure to perform their responsibilities that include, among other things, "the regulation and control of the flow of water of the Sabine River and control of the reservoir." PSA Section 5.02.
Disagreement between the parties arises over the issue of whether or not the current operating guide can be changed to provide for the establishment of 168 m.s.l. as the minimum reservoir level for routine power generation.
It appears that the citizens in the vicinity of the Toledo Bend Reservoir are advocating a 168 m.s.l. minimum reservoir level except when it is necessary to (1) maintain the minimum down river flow of the Sabine River, (2) inspect and/or repair the dam, and (3) prevent the threat of a "brownout". These citizens maintain that water levels below 168 m.s.l. adversely affects the recreational use of the reservoir by them and the tourism interests that have developed because of the reservoir.
The SRA's and the Companies take the position that establishing 168 m.s.l. as the minimum reservoir level for routine power generation would be a violation of the PSA. Officials of both the SRA's and the Companies have expressed the view that the PSA obligates the SRA's to provide water for the generation of hydroelectric power as long as the reservoir is above 162.2 m.s.l. (the minimum depth at which the turbines can operate). Specifically, the SRA's and the Companies are referring to Section 5.05 of the PSA. This Section of the PSA under Article V, Control of Water, is entitled "Scheduling of Production".
Pursuant to this section of the PSA, the "Authorities will normally operate the reservoir with water surfaces between elevation 162.2 mean sea level and elevation 172.0 mean sea level. Insofar as practicable, the reservoir will be maintained above elevation 169.0 mean sea level. The Authorities will cooperate with the Companies in obtaining the maximum power available consistent with Authorities' obligations". It would seem that "normal operation" of the reservoir between 162.2 and 172 m.s.l. can be modified by maintaining the reservoir at 169 m.s.l., "insofar as practicable", and consistent with the SRA's other obligations.
Section 5.05 of the PSA goes on to provide "Subject to the availability of water, Authorities will provide sufficient flow during the annual Peaking Period for the generation of at least 65,700,000 kilowatt hours. Except by prior written consent of the Authorities *** not more than 30,000,000 kilowatt hours shall be scheduled for generation in any one month". While the demand for electricity is certainly greater during the "Peaking Period" of the year (May-September), it appears that, subject to the availability of water, the only obligation of the SRA's is to provide a flow during this five month period for generation of up to 65,700,000 kilowatt hours, and no more.
Finally, this section of the PSA provides in part that "Authorities reserve and shall have the right *** to *** control their reservoirs in such manner as Authorities deem necessary*** to control properly the flow of the Sabine River for the purpose of performing and exercising Authorities' legal duties, rights and functions, and nothing in this Agreement shall in any way interfere with the full and complete performance thereof".
It is felt that a fair interpretation of this section does not warrant a conclusion that the SRA's have absolutely no choice but to provide water between 172 m.s.l and 162.2 m.s.l., while at the same time ignoring their other obligations and responsibilities. A reading of Section 5.05 with the other sections within Article V of the PSA reveals a recognition that the use of the flow of the Sabine River and the operation of the Toledo Bend Reservoir must accommodate other water requirements, not just the generation of hydroelectric power.
Article V of the PSA begins with Section 5.01 entitled "Obligations of Authorities". It states that the SRA's "shall have the right to operate the reservoir, including but not limited to power releases, in such a manner as the Authorities deem necessary to control properly the flow of the Sabine River for the purpose of performing the Authorities' statutory functions. * * * Nothing herein contained shall in any way interfere with the full and complete performance of the Authorities' obligations under the Constitutions and the laws of the States of Louisiana and Texas".
Section 5.02 of the PSA provides in part that the SRA' s "shall at all times respect such responsibilities to the public imposed upon them * * * by law, compact, governmental regulation or contract, relative to the * * * operation of the dam and control of the reservoir".
Section 5.03 of the PSA entitled "Contractual Obligations" states that the SRA's "covenant that they will use all available means to control the flow of the Sabine River to the extent necessary (1) to fulfill their statutory obligations, (2) to fulfill their contractual obligations to supply water to industries and others, and (3) to furnish water, to the extent and in the manner herein provided, for the efficient operation of the Generating Station".
Section 5.10 of the PSA entitled "Water Requirements for Purposes Other Than Generation of Power" provides in part that "It is recognized by the Authorities and the Companies that water from the reservoir will be needed for municipal, industrial and irrigation purposes below the dam. * * * In the event that such requirements for municipal, industrial and irrigation purposes below the dam exceed that amount which can be supplied from the specified minimum flows or if a demand develops for consumptive withdrawals directly from the reservoir, the Authorities shall have the right to modify the operation of Project from time to time to accommodate such water requirements".
While we have no information on what the Constitution and laws of Texas provide for insofar as the Sabine River Authority of Texas is concerned, we do know that the statutory functions and obligations imposed upon the Sabine River Authority of Louisiana include doing "all things necessary to facilitate economic development and to promote recreation and tourism within its jurisdiction". La. R.S. 38:2325(n).
It should also be noted that Article 37 of the Federal Power Commission License provides as follows: "The reservoir operation schedule shall be adjusted to accommodate the recreation use of the reservoir area as far as such adjustment is compatible with the primary purpose of the project and requirements of downstream releases".
Finally, it appears that the SRA's take the position that adopting 168 m.s.l. as the minimum reservoir level for routine power generation, instead of following the Operating Guide Rule Curve, would be a violation of the Agreement Incident To Second Amendment To Power Sales Agreement. Pursuant to this agreement, the SRA's obligated themselves to actively oppose any activity that would affect or alter the existing rights or contractual relationship of the parties to the PSA.
It is difficult to understand how the SRA's would be violating the PSA by no longer following this particular Operating Guide Rule Curve. We find no evidence that this Operating Guide Rule Curve has been adopted as part of the PSA, and the PSA requires that any amendments must be "by mutual consent in writing of the parties". PSA Section 8.09. As to the rights of the Companies, they have only the right, subject to availability of water, to a flow during the Peaking Period for generation of "at least 65,700,000 kilowatt hours". PSA Section 5.05.
In fact, if the SRA's monthly decision as to how water will be made available to the Companies for power generation is based simply on following this Operating Guide Rule Curve, then an argument may be made that the SRA's are not following Sections 5.05 and 5.06 of the PSA by advising the Companies with written notice of the estimated quantity of water for the coming month, including extra flows, that will be available for power generation.
This analysis is not an attempt to pass judgment on the SRA's exercise of judgment in operating the Toledo Bend Reservoir, but we do believe that the functions and obligations imposed upon the SRA's, contractually and statutorily, require that the flow of the Sabine River and the operation of the Toledo Bend Reservoir accommodate other water requirements, not simply the generation of hydroelectric power, especially during the months of May through September.
We hope that the above will be of some assistance to you in this matter.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: _________________________________ ROBERT H. CARPENTER, JR. Assistant Attorney General
RPI/RHC/tp